Barry I. Levy
Michael A. Sirignano
Jennifer Abreu
Alexandra Cusano
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

Docket No.: _____(      )

                  Plaintiffs,

      -against-

TOWN RX INC, MICHAEL NISANOV, IN & OUT RX
INC., BORIK NISANOV and JOHN DOE
DEFENDANTS "1" THROUGH "10",

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Town Rx Inc ("Town Rx"), Michael

Nisanov ("M. Nisanov"), In & Out Rx Inc. ("In & Out Rx"), and Borik Nisanov ("B. Nisanov"),

and John Doe Defendants "1" through "10" (the "John Doe Defendants") (collectively, the "Defendants"), hereby allege as follows:

1.      This action seeks to terminate a large, ongoing fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $2.1 million in fraudulent pharmaceutical billing to GEICO. The Defendants' scheme overwhelmingly targeted expensive topical prescription drug products, which they systematically dispensed to individuals involved in automobile accidents without regard for genuine patient care at multiple, different "medical clinics" throughout the New York Metropolitan area.  As part of the fraudulent scheme and to maximize profits, the Defendants paid unlawful kickbacks or provided other financial incentives to steer large volumes of medically unnecessary and often invalid and/or unauthorized prescriptions to Town Rx and In & Out Rx (collectively, the "Pharmacies").

2.      Town Rx and In & Out Rx purport to be separately owned, neighborhood pharmacies but in fact, have been used by Defendants M. Nisanov and B. Nisanov, along with the John Doe Defendants, as part of a single integrated fraud scheme to exploit patients for financial gain by overwhelmingly targeting Lidocaine 5% Ointment, Pennsaid External Solution 2%, and Diclofenac Sodium Gel 3% (the "Fraudulent Topical Pain Products"), as well as certain other prescription drug medications (collectively, the "Fraudulent Pharmaceuticals").  The Fraudulent Pharmaceuticals were dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").

3.      In furtherance of the scheme, the Defendants entered into illegal, collusive arrangements with various prescribing providers (the "Prescribers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical

clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these illegal, collusive agreements and to maximize profits, the Defendants steered the Prescribers and Clinic Controllers to prescribe and direct large volumes of prescriptions for the targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Topical Pain Products) to the Pharmacies.

4.    The Defendants, in exchange for paying kickbacks or providing other financial incentives, received thousands of medically unnecessary, duplicitous, and likely forged and unauthorized prescriptions from the Prescribers and/or Clinic Controllers pursuant to fraudulent predetermined protocols. These prescriptions included prescriptions issued under a physician's name using a phony address for the doctor (which is actually a "PO" box within a U.S. Post Office building) and invalid electronic prescriptions from physician assistants that fail to conform with New York law.

5.    As a result of their collusive arrangements with the Prescribers and Clinic Controllers, the Defendants submitted a large volume of fraudulent billing – more than $2.1 million – using each pharmacy name to bill GEICO in successive fashion. Specifically, the Defendants began billing under Town Rx, abruptly ceased that billing and then three months later, continued their scheme by billing under In & Out Rx over only five months before shutting down – all without any legitimate explanation beyond circumventing GEICO's investigation into their fraudulent pharmacy scheme.

6.    The Defendants intentionally targeted the Fraudulent Topical Pain Products to dispense to Insureds, in place of other effective but much-less costly prescription and non-prescription drug products, solely based on the medications' exorbitant pricing and high profit margins. In fact, about 82% of the billing submitted through the Pharmacies was for the Fraudulent Topical Pain Products, with charges typically ranging from $2,148.16 to $2,153.76 per single

prescription of Pennsaid External Solution 2%; $1,522.50 to $1,697.50 per single prescription of Lidocaine 5% Ointment; and $1,888.00 per single prescription of Diclofenac Sodium Gel 3%.

7.     By this action, GEICO seeks to recover approximately $323,002.17 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to the Pharmacies of more than $1.3 million in pending fraudulent No-Fault claims for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted through the Pharmacies because:

> (i)      the Defendants billed for Fraudulent Pharmaceuticals that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;
>
> (ii)     the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had the Pharmacies dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals in order to exploit the reimbursement rates set forth by 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule");
>
> (iii)    the Defendants participated in illegal, collusive relationships in which they steered Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies, in exchange for unlawful kickbacks and other financial incentives; and
>
> (iv)     the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals through the Pharmacies pursuant to illegal, invalid, and/or duplicitous prescriptions.

8.     The Defendants' scheme began in 2021 and continues uninterrupted to the present day as the Defendants continue to pursue collection on their unpaid fraudulent claims against GEICO, as well as against other New York automobile insurers.  The Defendants executed their complex fraudulent scheme through multiple pharmacies in order to reduce the volume of fraudulent pharmaceutical billing submitted under any single name or tax identification number, avoid detection, and thereby, perpetuate their scheme and increase their ill-gotten gains.

9.     As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally inflated the billable charges to GEICO and exploited the Pharmacy Fee Schedule by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they had the Pharmacies dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less-costly pharmaceuticals; and (iv) the Defendants submitted or caused to be submitted claims for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and/or duplicitous prescriptions, all while continuing to seek reimbursement on unpaid fraudulent claims.

10.     Based on the foregoing, the Defendants do not have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The charts attached hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through the Pharmacies using the United States mail or through interstate wires seeking reimbursement under New York's No-fault law. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $323,002.17.

## THE PARTIES

### IV.    Plaintiffs

11.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### V.    Defendants

12.    Defendant Town Rx is a New York corporation incorporated on or about January 21, 2021, with its principal place of business at 335 Central Avenue, Lawrence, New York. Town Rx was first registered with the New York State Education Department Office of Professions ("NYSOP") on or about July 19, 2021.

13.    Defendant M. Nisanov resides in and is a citizen of New York, and is the record owner of Town Rx.

14.    Defendant In & Out Rx is a New York corporation incorporated on or about November 10, 2022, with its principal place of business at 359 Central Avenue, Lawrence, New York. In & Out Rx was first registered with the NYSOP on or about October 18, 2023 – nearly a year *after* its formation.

15.    Defendant B. Nisanov resides in and is a citizen of New York, and is the record owner of In & Out Rx.

16.    Upon information and belief, Defendants M. Nisanov and B. Nisanov are related.

17.    In & Out Rx and B. Nisanov, among others, were named as defendants in a federal affirmative action wherein Liberty Mutual alleged the defendants dispensed and billed for medically unnecessary pharmaceuticals, nearly exclusively in the form of Lidocaine 5% Ointment,

Pennsaid External Solution 2%, and Cyclobenzaprine pursuant to predetermined treatment protocols and unlawful prescription referral arrangements with John McGee, D.O. See LM General Ins. Co. v. In & Out Rx Inc. et al., 1:24-cv-07431 (JAM) (E.D.N.Y. 2024).

18.     The Defendants submitted fraudulent claims to GEICO under different pharmacy names to conceal the fraud scheme, but each billed GEICO successively for substantially the same pharmaceuticals, have top prescribers in common, are located in close proximity to each other, and are represented by the same collections attorney, Gabriel & Moroff, PC.

19.     The John Doe Defendants are individuals and entities, presently not identifiable, who, along with the Defendants, participated in the operation and control of the Pharmacies, including facilitating the illegal, collusive agreements with the Prescribers and Clinic Controllers, and who, upon information and belief, reside in and are citizens of New York.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

22.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

24.    GEICO underwrites automobile insurance in the State of New York.

## I.    An Overview of New York's No-Fault Laws

25.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

26.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for medically necessary health care goods and services.

27.    The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

28.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

29.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

30.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

31.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient.

32.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

33.    Pharmacies "may be held liable for medically unnecessary services" submitted to No-Fault insurers similar to other "downstream providers." See Gov't Emples. Ins. Co. v. Advanced Comp. Lab., L.L.C., 2020 WL 7042648 (E.D.N.Y. December 1, 2020); 2020 U.S. Dist. LEXIS 224868 (E.D.N.Y. Dec. 1, 2020); Gov't Emples. Ins. Co. v. Wellmart RX, Inc., 435 F.

Supp. 3d 443 (E.D.N.Y. 2020). See also Long Is. Radiology v. Allstate Ins. Co., 36 A.D.3d 763, 764 (2d Dept. 2007).

**II.    An Overview of Applicable Licensing Laws**

34.    Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

35.    Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

36.    Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

37.    Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, contraindications for use in a specific patient, and clinical abuse or misuse.

38.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

39.     Pursuant to New York Education Law § 6810, as of March 27, 2016 "no practitioner shall issue any prescription in this state, unless such prescription is made by electronic prescription from the practitioner to a pharmacy."  Permitted exceptions include: (1) electrical or technological outages, (2) a waiver granted to the prescriber by the New York State Commissioner of Health based on a demonstrated exceptional hardship, (3) the use of electronic prescribing would cause a delay that would adversely affect the patient's health, (4) telephone prescriptions issued in emergency situations.

40.     For any non-electronic prescriptions issued in the state, New York Education Law § 6810 requires the prescriber to explicitly state in the patient's health record the specific exempt reason for why the prescription was issued in a manner other than electronically.

41.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

42.     New  York Education Law § 6512, § 6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

43.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

44.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

45.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

46.     Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

47.     Pursuant to New York Education Law § 6808(e), every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

48.     Pursuant to New York Education Law § 6808(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

49.     Pursuant to New York Education Law § 6808(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

50.     Pursuant to New York Education Law § 6808(h), "an application for registration as a pharmacy shall be over good moral character."

## III.    The Defendants' Fraudulent Scheme

### A.    Overview of the Scheme

51.    Beginning in 2021 and continuing uninterrupted through the present day, the Defendants implemented an integrated fraudulent scheme in which they used the Pharmacies to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges – which they were not eligible to receive – for Fraudulent Pharmaceuticals purportedly dispensed to the Insureds.

52.    Town Rx and In & Out Rx presented themselves as independent, locally-owned, neighborhood pharmacies operating in and catering to the local community in Lawrence, New York, when in fact, the Defendants began using Town Rx in 2021 and subsequently, In & Out Rx in 2024, as part of a single large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the same Fraudulent Pharmaceuticals in a predetermined, protocol fashion, while intentionally ignoring a vast array of other medications readily available at a fraction of the cost.

53.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Town Rx and In & Out Rx's business targeted a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products), which made up the overwhelming majority of claims submitted to GEICO.  Specifically, the Defendants have submitted – to GEICO alone – over $1.7 million in claims for reimbursement for the Fraudulent Topical Pain Products, which account for more than 80% of the billing submitted through the Pharmacies.

54.    The Fraudulent Topical Pain Products overwhelming targeted by the Defendants included Lidocaine 5% Ointment, Pennsaid External Solution 2%, and Diclofenac Sodium Gel 3%, with charges typically ranging from $1,522.50 to $1,697.50 per prescription of Lidocaine 5%

Ointment, from $2,148.16 to $2,153.76 per prescription of Pennsaid External Solution 2%, and $1,888.00 per prescription of Diclofenac Sodium Gel 3%.

55.    The Defendants chose these products – Lidocaine 5% Ointment, Pennsaid (diclofenac sodium) External Solution 2%, and Diclofenac Sodium Gel 3% – because they could acquire them at low cost and submit inflated claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves. Moreover, the Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws, thus leading the Defendants to target the prescription of the Fraudulent Topical Pain Products despite the lack of medical necessity for these particular products.

56.    Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services noted that Lidocaine and Diclofenac have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

57.    The remaining billing submitted through the Pharmacies was primarily for muscle relaxers and oral non-steroidal anti-inflammatory drugs ("NSAIDs") as part of the scheme to defraud GEICO.

58.    Defendants M. Nisanov and B. Nisanov, along with the John Doe Defendants, operated the Pharmacies for the sole purpose of effectuating a multimillion-dollar pharmacy fraud scheme.

59.    The Defendants implemented their fraud scheme by using Town Rx to submit more than $1.3 million in billing to GEICO from September of 2021 to October of 2023, at which time

the Defendants abruptly ceased that billing and thereafter continued their scheme by billing under In & Out Rx.

60.      Specifically, on or about October 18, 2023 – 2 weeks after Town Rx shut down its active operation – In & Out Rx was first registered with the NYSOP to operate as a pharmacy *on the same block* as Town Rx.  Thereafter, in January of 2024, the Defendants began using In & Out Rx to continue submitting fraudulent billing to GEICO.

61.      In & Out Rx did not engage in any legitimate marketing or advertising, maintained no website, and did virtually nothing that would be expected of a legitimate pharmacy to develop its reputation, attract customers, and draw legitimate business.

62.      Further, In & Out Rx was situated at the rear of the building located at 359 Central Ave, Lawrence, New York, which lacked any signage or awning displaying the pharmacy's name, was not visible to the public, and the pharmacy was kept locked with a numeric keypad during normal business hours, thereby preventing any walk-in patients.

63.      Despite this, over the course of merely five months – from January 2024 to May 2024 – the Defendants submitted significant billing to GEICO totaling more than $670,000.00.  It is highly unlikely that legitimate "community retail pharmacies" would be able to generate that much billing in such a short period of time and without any legitimate marketing or advertising efforts.  It is also highly unlikely that in the event a community retail pharmacy was able to legitimately generate that much billing in that short of a time it would then abruptly cease billing and stop operating such a profitable business.

64.      Defendants M. Nisanov and B. Nisanov are the purported sole owners of Town Rx and In & Out Rx, respectively, but others presently not identifiable (i.e., the John Doe Defendants) exercised ownership and control over the Pharmacies despite not being owners of record, and

facilitated illegal referral and financial arrangements designed to steer large volumes of prescriptions to the Pharmacies and generate large profits from the submission of fraudulent insurance claims to GEICO and other No-Fault insurers.

65.    M. Nisanov is not a licensed pharmacist and did not own or operate any other pharmacy prior to becoming the sole record owner and operator of Town Rx.  Similarly, B. Nisanov is not a licensed pharmacist and upon information and belief, does not have any background or experience in the pharmacy business.

66.    Moreover, M. Nisanov could not recall pertinent aspects of the pharmacy's formation and operation – despite purporting to be its sole owner – including (i) how much startup capital he purportedly borrowed from his father to invest into the pharmacy or how much he owed; (ii) how he found the pharmacy's location or how much he spent in construction costs; and (iii) the full name of the "family friend" who referred him to the collections law firm that represents Town Rx.

67.    In furtherance of the fraudulent scheme, and in keeping with the fact that M. Nisanov and B. Nisanov had no prior pharmacy experience, the Defendants and the John Doe Defendants entered into complex financial arrangements with one another and others, including Prescribers and Clinic Controllers at the No-Fault Clinics, that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks or other financial incentives for large volumes of medically unnecessary prescriptions for specifically targeted Fraudulent Topical Pain Products.

68.    Notably, the Prescribers and the No-Fault Clinics that were the main source of the prescriptions steered to the Pharmacies have been the subject of investigations and lawsuits with regard to their fraudulent billing and treatment practices, and have been the source of excessive,

fraudulent treatment and billing schemes aimed at generating profits without regard to genuine patient care.

69.     Unlicensed laypersons (i.e., the Clinic Controllers), rather than the healthcare professionals working at the No-Fault Clinics, create and control the patient bases at the clinics, dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care, and select and dictate the downstream providers (like, pharmacies) that receive prescriptions and referrals issued at the No-Fault Clinics. These predetermined protocols almost always involve the rendering and prescribing of excessive medically unnecessary healthcare goods and services and illegal referral and/or prescription practices.

70.     The prescriptions for the Fraudulent Topical Pain Products steered to the Defendants were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, and excessive healthcare services, including prescriptions for pharmaceuticals, as part of predetermined protocols and collusive arrangements.  Further, the Fraudulent Topical Pain Products themselves often had no proven efficacy beyond what an over-the-counter equivalent could provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

71.     In keeping with the fact that the prescriptions were the byproducts of illegal, collusive arrangements and fraudulent treatment protocols, nearly 88% of the billing submitted to GEICO by the Defendants through Town Rx was based on prescriptions issued, or purportedly issued, by only two practitioners, John J. McGee, D.O. ("Dr. McGee") and Sonia Sikand, P.A. ("PA Sikand").  Specifically, Dr. McGee and PA Sikand's prescriptions were responsible for more than $859,000.00 in pharmaceutical billing submitted to GEICO through Town Rx.  Dr. McGee is the record owner of Beach Medical Rehabilitation P.C. ("Beach Medical"), while PA Sikand is a

practitioner associated with Macintosh Medical, P.C. ("Macintosh Medical") and Atlantic Medical & Diagnostic, P.C. ("Atlantic Medical").

72.    Notably, Dr. McGee has a significant history of being associated with healthcare fraud schemes. Dr. McGee and several of his professional corporations – including Beach Medical – were previously sued by multiple automobile insurers based on allegations that McGee performed medically unnecessary healthcare services and allowed unlicensed laypersons to illegally exercise ownership and control over his purported professional corporations and use them to submit fraudulent claims to no-fault insurers.  See Allstate Ins. Co. et al. v. Rauch, D.C. et al., 2:22-cv-02424 (JMA)(LGD) (E.D.N.Y. 2022); State Farm Mut. Auto. Ins. Co. v. McGee et al., 1:10-cv-03848 (PKC)(RML) (E.D.N.Y. 2010); see also Allstate Ins. Co. et al. v. Ilyaich et al., 1:13-cv-05464 (NG)(LB) (E.D.N.Y. 2013). Further, Dr. McGee was recently sued by GEICO based on allegations that Dr. McGee engaged in illegal kickback and referral schemes and submitted fraudulent no-fault charges to GEICO and other insurers for excessive and medically unnecessary healthcare services.  See Gov't Emples. Ins. Co. et al. v. McGee et al., 1:23-cv-07753 (NCM)(PK) (E.D.N.Y. 2023).

73.    Town Rx also received voluminous prescriptions from PA Sikand, an employee of Macintosh Medical and Atlantic Medical.  Macintosh Medical and Atlantic Medical purport to be legitimate professional corporations owned on paper by Jonathan Landow, M.D. ("Dr. Landow"). However, Dr. Landow and various of his professional corporations (including Atlantic Medical and Macintosh Medical) have been sued by New York automobile insurers for alleged fraud schemes involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. See USAA v. Jonathan Landow, M.D. et al., 1:24-cv-03471 (NRM)(MMH) (E.D.N.Y. 2024); Allstate

Ins. Co. v. Jonathan S. Landow, M.D. et al., 1:24-cv-02010 (DLI)(JRC) (E.D.N.Y. 2024); Gov't Emples. Ins. Co. et al. v. Landow, et al., 1:21-cv-01440 (NGG)(RER)(E.D.N.Y. 2021).

74.    In many instances, Town Rx dispensed Fraudulent Pharmaceuticals in response to electronic prescriptions purportedly issued by PA Sikand, but these electronic prescriptions failed to conform with New York law in that they did not contain the name of the supervising physician (the "Invalid E-Scripts"). See e.g., 10 NYCRR § 94.2.  In some instances, Town Rx  also received Invalid E-Scripts purportedly issued by Aleksandr Kopach, P.A. ("PA Kopach") and Scott Lyons P.A. ("PA Lyons") – physician assistants also associated with Macintosh Medical and Atlantic Medical.

75.    Moreover, in other instances, Town Rx also dispensed Fraudulent Pharmaceuticals in response to electronic prescriptions purportedly issued by Hershel Kotkes, M.D. ("Dr. Kotkes"), but these prescriptions contained a phony address for the doctor, which address is actually a post office box within the U.S. Post Office building in Lawrence, New York.  Dr. Kotkes was a named defendant in at least two federal litigations commenced by no-fault insurance carriers involving allegations of billing for medically unnecessary healthcare services and referring patients for medically unnecessary healthcare services. See State Farm Mut. Auto. Ins. Co. et al. v. Herschel Kotkes, M.D., P.C. et al., 1:22-cv-03611 (NRM)(RER) (E.D.N.Y. 2022); Allstate Ins. Co. et. al. v. Excell Clinical Lab, Inc. et al., 2:22-cv-00334 (ARR)(LGD) (E.D.N.Y. 2022).

76.    While Town Rx received prescriptions from various Prescribers, in 2023, Dr. McGee overwhelmingly become the top prescriber to Town Rx. Specifically, Dr. McGee's prescriptions alone were responsible for about 92% of Town Rx's billing to GEICO in 2023.

77.    In keeping with the fact that the Defendants operated the Pharmacies as part of an integrated scheme, and pursuant to illegal, collusive arrangements, the Defendants continued to

receive voluminous prescriptions issued by Dr. McGee – along with a nurse practitioner, Elizabeth Lafargue, N.P. ("NP Lafargue") – that were then dispensed and billed through In & Out Rx *after* Town Rx shut down its operation.

78.    In fact, about 94% of the billing submitted to GEICO by the Defendants through In & Out Rx was based on prescriptions issued, or purportedly issued, by Dr. McGee and NP Lafargue, with prescriptions originating from both Beach Medical and South Bronx Medical Rehabilitation P.C. ("South Bronx Medical") – another professional corporation owned on paper by Dr. McGee.  Dr. McGee and NP Lafargue's prescriptions resulted in more than $714,000.00 in pharmaceutical billing to GEICO through In & Out Rx, with Dr. McGee's prescriptions alone accounting for more than $659,000.000 in pharmaceutical billing.

79.    Both Town Rx and In & Out Rx received and dispensed virtually identical sets of prescriptions from Dr. McGee.  Specifically, Town Rx and In & Out Rx routinely received prescriptions for two specific Fraudulent Topical Pain Products, namely, Lidocaine 5% Ointment and Pennsaid External Solution 2%, and in many instances, in conjunction with an oral medication (e.g., Cyclobenzaprine), on a single date for a single patient.  For example:

- On July 12, 2023, Insured T.W. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at a No-Fault Clinic located at 1 Cross Island Plaza, Rosedale, New York (the "Cross Island Plaza Clinic").  On August 8, 2023, Dr. McGee issued prescriptions to T.W. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by Town Rx on August 31, 2023. Notably, Dr. McGee's purported examination report indicates that T.W. has a history of hypertension and diabetes, and is taking three medications, including insulin to treat the diabetes. Despite T.W.'s medical history, and the increased risks of a thrombotic event (the formation of a blot clot in a blood vessel) in connection with the combined use of the prescribed medications, Dr. McGee failed to instruct the patient to only use Pennsaid External Solution 2% as necessary and as little as possible.

- On May 27, 2023, Insured P.G. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at the Cross Island

Plaza Clinic. On August 8, 2023, Dr. McGee issued prescriptions to P.G. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by Town Rx on September 8, 2023.

- On May 25, 2023, Insured T.T. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at the Cross Island Plaza Clinic. On August 31, 2023, Dr. McGee issued prescriptions to T.T. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by Town Rx on September 5, 2023.

- On May 30, 2023, Insured N.S. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at the Cross Island Plaza Clinic. On August 7, 2023, Dr. McGee issued prescriptions to N.S. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by Town Rx on August 22, 2023.

- On July 22, 2023, Insured T.M. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at the Cross Island Plaza Clinic. On August 22, 2023, Dr. McGee issued prescriptions to T.M. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by Town Rx on September 11, 2023.

- On April 28, 2024, Insured F.A. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at a No-Fault Clinic located at 384 East 149th Street, Bronx, New York. On May 7, 2024, Dr. McGee issued prescriptions to F.A. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by In & Out Rx on May 15, 2024.

- On March 31, 2024, Insured T.C. was allegedly involved in a motor vehicle, and thereafter, sought treatment with Dr. McGee at a No-Fault Clinic located at 1200 Waters Place, Bronx, New York. On April 3, 2024, Dr. McGee issued prescriptions to T.C. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by In & Out Rx on April 10, 2024.

- On November 13, 2023, Insured M.B. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at a No-Fault Clinic located at 3407 White Plains Rd, Bronx, New York. On February 5, 2024, Dr. McGee issued prescriptions to M.B. for: (i) Lidocaine 5% Ointment; and (ii) Pennsaid External Solution 2%, which were dispensed by In & Out Rx on February 21, 2024.

- On October 12, 2023, Insured S.V. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at a No-Fault Clinic located at 4250 White Plains Rd., Bronx, New York. On February 1,

2024, Dr. McGee issued prescriptions to S.V. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by In & Out Rx on March 14, 2024.

- On March 13, 2024, Insured J.A. was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at a No-Fault Clinic located at 1200 Waters Place, Bronx, New York. On March 20, 2024, Dr. McGee issued prescriptions to J.A. for: (i) Lidocaine 5% Ointment; (ii) Pennsaid External Solution 2%; and (iii) Cyclobenzaprine, which were dispensed by In & Out Rx on April 3, 2024.

80.    In total, the Defendants submitted more than $1.1 million in pharmaceutical billing to GEICO through the Pharmacies based on Dr. McGee's prescriptions.

81.    Dr. McGee worked out of multiple No-Fault Clinics from which he steered prescriptions to the Defendants, including the Cross Island Plaza Clinic, 1200 Waters Place, Bronx, New York, 384 E. 149th Street, Bronx, New York, and 4250 White Plains Rd., Bronx, New York. These No-Fault Clinics present themselves to be legitimate healthcare practices when, in fact, they are medical mills that house a "revolving door" of numerous healthcare providers that subject Insureds to as many healthcare goods and services as possible to exploit their No-Fault Benefits and submit large volumes of fraudulent claims to No-Fault insurers like GEICO.

82.    For example, GEICO has received billing in "revolving door" fashion from at least 110 different healthcare provider "names" for services rendered at the clinic located at 4250 White Plains Rd., Bronx, New York.

83.    As further example, GEICO has received billing in "revolving door" fashion from at least 56 different healthcare provider "names" for services rendered at the Cross Island Plaza Clinic.

84.    In keeping with the fact that the No-Fault Clinics were geared to exploiting New York's No-fault insurance system, including through the prescribing and dispensing of the Fraudulent Pharmaceuticals, the initial examination reports issued by, or in the name of Dr. McGee

included voluminous boilerplate lists of predetermined services and goods for virtually every Insured. For example:

**OVERALL PLAN:**

1. 30 Day medication including Pennsaid, 2% 112g Solution, Apply 2-3 Times Daily to Affected Areas, Lidocaine Ointment 5% 250 g and Cyclobenzaprine 7.5mg 90 Tablets will be prescribed
2. Physical Therapy and Chiropractic care 3-4x a week for 4-6 weeks.
3. Durable Medical Equipment for at-home use including Game-Ready, SAM, Cervical Collar, Cervical Pillow, Lumbar Sacral Support, Lumbar Cushion, Bed Board, Egg Crate Mattress, Orthopedic Massage Chair, EMS unit 4 leads, TENS/EMS placement belt, Infrared Red Heating Lamp and Massager as medically indicated.
4. To further rule out muscle tears, radiculopathy, and/or disc herniations, the following diagnostic testing has been ordered: EMG/NCV, and MRIs of Cervical Spine, Thoracic Spine, Lumbar Spine as medically indicated
5. Completed diagnostic testing has been reviewed with the patient and they have been referred to Orthopedic and/or Pain management specialists. Additional DME items such as custom bracing has been ordered as necessary.
6. Patient will present for follow-up exam in 3-4 weeks to assess progress and review results of diagnostic testing.

████████████    *DOS: 10/10/2023*                                                      *Page 4/7*

85.    As further evidence that the Defendants operated Town Rx and In & Out Rx as an integrated fraud scheme, the Pharmacies each received voluminous prescriptions for substantially the same pharmaceuticals, each received the significant majority of their prescriptions from the same Prescriber (i.e., Dr. McGee), each used similar billing forms, each used similar delivery forms, each billed successively over brief time periods, and each is represented by the same collections law firm to pursue payment and collections against GEICO and other insurers for the Fraudulent Pharmaceuticals.

86.    The Defendants' scheme to dispense the Fraudulent Pharmaceuticals in large volumes using kickbacks or other financial incentives ensured that the Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies regardless of (i) the distance of the pharmacy to the Insureds' residences or the Prescribers' practices and (ii) the fact that there were countless other pharmacies located much closer to the Insureds' residences.

87.     In keeping with the fact that the Defendants illegally steered the Prescribers and Clinic Controllers at the No-Fault Clinics to provide the Pharmacies with prescriptions for the Fraudulent Pharmaceuticals, Insureds were virtually never given the option to use a pharmacy of their choosing.

88.     In fact, nearly 88% of the Insureds that allegedly received pharmaceuticals dispensed by Town Rx lived outside of Nassau County, New York, where the pharmacy is located, with the Insureds' residences scattered throughout Queens, Brooklyn, the Bronx, and Manhattan. In some instances, the Insureds who received, or purportedly received, pharmaceuticals dispensed by Town Rx resided outside the State of New York, such as New Jersey, Connecticut, and Pennsylvania.

89.     Further, about 98% of the Insureds that allegedly received pharmaceuticals dispensed by In & Out Rx lived outside of Nassau County, New York, where the pharmacy is located, with these Insureds' residences scattered throughout the Brooklyn, Bronx, and Manhattan. In some instances, the Insureds who received, or purportedly received, pharmaceuticals dispensed by In & Out Rx lived in counties outside of New York City, including Westchester County and Richmond County, and with some residences located outside of the State of New York, such as New Jersey.

90.     But for the Defendants' illegal, collusive agreements with the Prescribers and Clinic Controllers, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their place of residence.

91.     Instead, the Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to Town Rx and In & Out Rx, irrespective of the Pharmacies'

inconvenient location to the Insureds' residences or the Prescribers' practices, because the prescriptions were being issued pursuant to illegal, collusive kickback agreements.

92.     The Pharmacies, in exchange for the payment of kickbacks or other financial incentives, received medically unnecessary prescriptions from the Prescribers and Clinic Controllers at the No-Fault Clinics pursuant to fraudulent predetermined protocols.

93.     The Defendants used the prescriptions obtained from the No-Fault Clinics to bill GEICO and other insurers for the Fraudulent Pharmaceuticals.

94.     The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

95.     After having the prescriptions steered to the Pharmacies, the Defendants purportedly delivered the Fraudulent Pharmaceuticals directly to the Insureds' residence, or alternatively, delivered the Fraudulent Pharmaceuticals to the No-Fault Clinics.

96.     In furtherance of the scheme, the Defendants use Gabriel & Moroff, P.C. to pursue collections from GEICO on the bills submitted for the Fraudulent Pharmaceuticals through Town Rx and In & Out Rx in piece-meal fashion, primarily through numerous, separate expedited "No-Fault arbitrations" but also through individual civil court lawsuits, all of which is designed to obscure the fraud and monetize the scheme as quickly as possible.  Gabriel & Moroff, P.C., and potentially other law firms, routinely file expensive and time-consuming collection proceedings against GEICO and other insurers if the charges are not promptly paid in full. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacies have been engaged in fraud.

97.     The Defendants' collection efforts through numerous, separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent

scheme since the Defendants know it is impractical for a no-fault arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale, complex fraud scheme involving multiple pharmacies and numerous patients across numerous different clinics located throughout the metropolitan area.

98.     The Defendants implemented their pharmaceutical fraud scheme involving the Prescribers and Clinic Controllers knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive agreements intended to inflate the billing from the Pharmacies to insurers and to financially enrich the Defendants; (iii) the Defendants intentionally inflated the billing to GEICO by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they dispensed in large volumes to Insureds through the Pharmacies with exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC and prescription medications proven to have therapeutic effects and available at a fraction of the cost.

99.     The Prescribers and Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

**B.      The Fraudulent Pharmaceuticals Were Prescribed and Dispensed For Financial Gain and Without Genuine Regard for Patient Care**

100.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner.  Notwithstanding this basic goal, the Insureds treated by the Prescribers at the No-Fault

Clinics associated with the Clinic Controllers – and who received pharmaceuticals from the Pharmacies – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacks in individualized patient care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

101.    Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits.  For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain.  Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

102.    More recently, in 2019, the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report, which focused on pain management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report

indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

103.    Like the WHO and DHHS, the New York State Workers' Compensation Board's ("NYS WCB") published medical treatment guidelines stating that oral NSAIDs are recommended as first-line medications for the treatment of neck and back pain, and that over-the-counter medications should be tried prior to prescription NSAIDs. See New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 36); New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 32).

104.    Drugs should not be prescribed when there is no indication for use as every medication carries an inherent risk for adverse events.

105.    Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

106.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated.  For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

107.    With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs, such as Diclofenac Gel 1% have shown that they are no more effective than a placebo.

108.    Despite these guidelines and the basic goal of helping patients recover in a timely fashion, the Prescribers produced generic and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds as part of a predetermined protocol, which lacked any individualized treatment whatsoever. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products.

109.    Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

110.    The Prescribers also often failed to document in their examination reports whether the patients were intolerant of oral medications thereby necessitating a prescription for a Fraudulent Topical Pain Product.

111.    The Prescribers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by the Pharmacies were actually used by the patient.

112.    The Prescribers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals dispensed by the Pharmacies provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

113.    Nevertheless, the Prescribers routinely prescribed voluminous Fraudulent Pharmaceuticals, including multiple Fraudulent Topical Pain Products on the same date to a single patient.

114.    In keeping with the fact that the Defendants targeted a specific set of exorbitantly priced pharmaceuticals that were not medically necessary and were prescribed and dispensed pursuant to predetermined treatment protocols and illegal, collusive agreements, Insureds involved in the same motor vehicle accident were often subjected to nearly identical course of treatment and prescribed the same set of Fraudulent Pharmaceuticals, regardless of the Insured's individual circumstances or actual injuries, and without regard to genuine patient care.  For example:

- On March 23, 2022, three Insureds – E.V., S.A., and L.S. – were involved in the same motor vehicle accident. Thereafter, E.V., S.A., and L.S. sought treatment with PA Sikand of Macintosh Medical at a No-Fault Clinic located at 175-20 Hillside Avenue, Jamaica, New York.  E.V., S.A., and L.S. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, E.V., S.A., and L.S. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Lidocaine 5% Ointment and Cyclobenzaprine.

  o On April 12, 2022, Town Rx dispensed Lidocaine 5% Ointment and Cyclobenzaprine to E.V. pursuant to prescriptions purportedly issued by PA Sikand on April 11, 2022.
  o On April 14, 2022, Town Rx dispensed Lidocaine 5% Ointment and Cyclobenzaprine to S.A. pursuant to prescriptions purportedly issued by PA Sikand on April 6, 2022.
  o On April 19, 2022, Town Rx dispensed Lidocaine 5% and Cyclobenzaprine to L.S. pursuant to prescriptions purportedly issued by PA Sikand on April 6, 2022.

- On December 11, 2021, two Insureds – V.B. and R.B. – were involved in the same motor vehicle accident. Thereafter, V.B. and R.B. sought treatment with PA Sikand of Macintosh Medical at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York. V.B. and R.B. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, V.B. and R.B. were issued multiple prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment and Baclofen.

  o On December 17, 2021, Town Rx dispensed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Baclofen to V.B. pursuant to prescriptions purportedly issued by PA Sikand on December 16, 2021. On January 21, 2022, Town Rx again dispensed the same pharmaceuticals to V.B. pursuant to prescriptions purportedly issued by PA Sikand on January 20, 2022.
  o On December 17, 2021, Town Rx dispensed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Baclofen to R.B. pursuant to prescriptions purportedly issued by PA Sikand on December 16, 2021. On January 21, 2022,

Town Rx again dispensed the same pharmaceuticals to R.B. pursuant to prescriptions purportedly issued by PA Sikand on January 20, 2022.

- On December 21, 2021, two Insureds – G.G. and N.B. – were involved in the same motor vehicle accident. Thereafter, G.G. and N.B. sought treatment with PA Sikand of Macintosh Medical at a No-Fault Clinic located at 71 South Central Avenue, Valley Stream, New York. G.G. and N.B. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, G.G. and N.B. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment and Baclofen.

  o On January 4, 2022, Town Rx dispensed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Baclofen to G.G. pursuant to prescriptions purportedly issued by PA Sikand on December 30, 2021.
  o On January 4, 2022, Town Rx dispensed Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and Baclofen to N.B. pursuant to prescriptions purportedly issued by PA Sikand on December 30, 2021.

- On January 2, 2024, two Insureds – J.S. and C.S. – were involved in the same motor vehicle accident. Thereafter, J.S. and C.S. sought treatment with Dr. McGee of Beach Medical at a No-Fault Clinic located at 384 E. 149 Street, Suite 504, Bronx, New York. J.S. and C.S. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, J.S. and C.S. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine.

  o On January 26, 2024, In & Out Rx dispensed Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine to J.S. pursuant to prescriptions purportedly issued by Dr. McGee on January 15, 2024.
  o On January 29, 2024, In & Out Rx dispensed Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine to C.S. pursuant to prescriptions purportedly issued by Dr. McGee on January 15, 2024.

- On February 6, 2024, two Insureds – J.G. and J.M.G. – were involved in the same motor vehicle accident. Thereafter, J.G. and J.M.G. sought treatment with Dr. McGee of South Bronx Medical at a No-Fault Clinic located at 4250 White Plains Rd., Bronx, New York. J.G. and J.M.G. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, J.G. and J.M.G. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Pennsaid External Solution 2% and Lidocaine 5% Ointment.

  o On February 12, 2024, In & Out Rx dispensed Pennsaid External Solution 2% and Lidocaine 5% Ointment to J.G. pursuant to prescriptions purportedly issued by Dr. McGee on February 8, 2024.

- o On February 12, 2024, In & Out Rx dispensed Pennsaid External Solution 2% and Lidocaine 5% Ointment to J.M.G. pursuant to prescriptions purportedly issued by Dr. McGee on February 8, 2024.

- On March 13, 2024, two Insureds – J.A. and A.A. – were involved in the same motor vehicle accident. Thereafter, J.A. and A.A. sought treatment with Dr. McGee of Beach Medical at a No-Fault Clinic located at 1200 Waters Place, Suite 112, Bronx, New York. J.A. and A.A. were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, J.A. and A.A. were issued prescriptions for the same set of Fraudulent Pharmaceuticals, namely, Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine.

  - o On April 3, 2024, In & Out Rx dispensed Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine to J.A. pursuant to prescriptions purportedly issued by Dr. McGee on March 20, 2024. On May 6, 2024, In & Out Rx again dispensed the same pharmaceuticals to J.A. pursuant to prescriptions purportedly issued by Dr. McGee on April 25, 2024.
  - o On April 3, 2024, In & Out Rx dispensed Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine to A.A. pursuant to prescriptions purportedly issued by Dr. McGee on March 20, 2024. On May 1, 2024, In & Out Rx again dispensed the same pharmaceuticals to A.A. pursuant to prescriptions purportedly issued by Dr. McGee on April 25, 2024.

115.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

116.    It is extremely improbable that multiple Insureds involved in the same automobile accident routinely require the same pharmaceutical products.

117.    Even so, pursuant to the fraudulent and collusive arrangements, and as demonstrated herein, the Prescribers prescribed, and the Pharmacies dispensed the same set of Fraudulent Pharmaceuticals to Insureds involved in a single motor vehicle accident, without regard to individualized, genuine patient care.

118.    In further keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary, but rather prescribed and dispensed pursuant to profit-driven and predetermined treatment protocols and collusive arrangements, in many instances, the Defendants

dispensed the targeted Fraudulent Pharmaceuticals many weeks *after* the prescriptions were purportedly issued by the Prescribers. For example:

- On June 14, 2021, Insured J.T. was involved in a motor vehicle accident and thereafter, sought treatment with Ruben Oganesov, M.D. ("Dr. Oganesov") of Emmons Avenue Medical Office PC ("Emmons Avenue Medical") at a No-Fault Clinic located at 60 Belmont Avenue, Brooklyn, New York. On September 14, 2021, <u>more than 1 month after</u> the prescriptions were issued, Town Rx dispensed Lidocaine 5% Ointment and Naproxen to J.T. pursuant to a pre-printed prescription form purportedly issued by Dr. Oganesov on August 11, 2021. Notably, Dr. Oganezov's purported prescriptions are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider. Moreover, the pre-printed prescription form purportedly issued by Dr. Oganesov does not appear to contain an actual signature.

- On June 14, 2021, Insured C.H. was involved in a motor vehicle accident and thereafter, sought treatment with Dr. Oganesov of Emmons Avenue Medical at a No-Fault Clinic located at 60 Belmont Avenue, Brooklyn, New York. On September 14, 2021, <u>nearly 1 month after</u> the prescriptions were issued, Town Rx dispensed Lidocaine 5% Ointment and Celecoxib (brand name: Celebrex) to C.H. pursuant to a pre-printed prescription form purportedly issued by Dr. Oganesov on August 17, 2021. Notably, Dr. Oganezov's purported prescriptions are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider. Moreover, Dr. Oganesov's purported signature on the pre-printed prescription form does not match his signature on the examination report signed by him.

- On August 19, 2021, Insured B.W. was involved in a motor vehicle accident, and thereafter, sought treatment with Cathy Delerme-Pagan, M.D. ("Dr. Delerme-Pagan") of 406 Medical PC ("406 Medical") at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York. On September 21, 2021, <u>nearly 1 month after</u> the prescriptions were issued, Town Rx dispensed Lidocaine 5% Ointment and Methocarbamol to B.W. pursuant to prescriptions purportedly issued by Dr. Delerme-Pagan on August 25, 2021.

- On August 19, 2021, Insured B.P. was involved in a motor vehicle accident, and thereafter, sought treatment with Dr. Delerme-Pagan of 406 Medical at a No-Fault Clinic located at 1650 Eastern Parkway, Brooklyn, New York. On October 6, 2021, <u>over 6 weeks after</u> the prescriptions were issued, Town Rx dispensed Lidocaine 5% Ointment and Acetaminophen (brand name: Tylenol) to B.P. pursuant to prescriptions purportedly issued by Dr. Delerme-Pagan on August 25, 2021. Notably, Dr. Delerme-Pagan's purported examination report indicates a history of hypertension and chronic obstructive pulmonary disease. Additionally, Dr. Delerme-Pagan's purported

examination report further indicates that B.P. is taking Xarelto to prevent stroke due to atrial fibrillation, which is cardiac arrhythmia. Lidocaine 5% Ointment carries a risk of cardiac arrhythmia if taken in excessive dose or too frequently. Despite this, and B.P.'s medical history and age, Dr. Delerme-Pagan failed to provide specific instructions for the application, dosage and maximum number of applications per day.

- On May 21, 2023, Insured S.F. was involved in a motor vehicle accident, and thereafter, sought treatment with Dr. McGee at Beach Medical at the Cross Island Plaza Clinic. On September 11, 2023, nearly 3 weeks after the prescriptions were issued, Town Rx dispensed Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine to S.F. pursuant to prescriptions purportedly issued by Dr. McGee on August 22, 2023.

- On October 25, 2023, Insured C.O. was involved in a motor vehicle accident, and thereafter, sought treatment with NP Lafargue of South Bronx Medical at a No-Fault Clinic located at 2386 Jerome Ave, 2nd Floor, Bronx, New York. On February 21, 2024, more than 3 weeks after the prescriptions were issued, In & Out Rx dispensed Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine to C.O. pursuant to prescriptions purportedly issued by NP Lafargue on January 30, 2024.

- On October 25, 2023, Insured A.O. was involved in a motor vehicle accident, and thereafter, sought treatment with NP Lafargue of South Bronx Medical at a No-Fault Clinic located at 2386 Jerome Ave, 2nd Floor, Bronx, New York. On February 21, 2024, more than 3 weeks after the prescriptions were issued, In & Out Rx dispensed Pennsaid External Solution 2% and Lidocaine 5% Ointment to A.O. pursuant to prescriptions purportedly issued by NP Lafargue on January 30, 2024.

- On October 25, 2023, Insured M.E. was involved in a motor vehicle accident, and thereafter, sought treatment with NP Lafargue of South Bronx Medical at a No-Fault Clinic located at 2386 Jerome Ave, 2nd Floor, Bronx, New York. On February 21, 2024, more than 3 weeks after the prescriptions were issued, In & Out Rx dispensed Pennsaid External Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine to M.E. pursuant to prescriptions purportedly issued by NP Lafargue on January 30, 2024.

- On February 2, 2024, Insured L.B. was involved in a motor vehicle accident, and thereafter, sought treatment with NP Lafargue of South Bronx Medical at a No-Fault Clinic located at 700 Utica Ave, Brooklyn, New York. On February 26, 2024, more than 3 weeks after the prescriptions were issued, In & Out Rx dispensed Pennsaid External Solution 2% and Lidocaine 5% Ointment to L.B. pursuant to prescriptions purportedly issued by NP Lafargue on February 2, 2024.

- On November 12, 2023, Insured R.W. was involved in a motor vehicle accident, and thereafter, sought treatment with NP Lafargue of South Bronx Medical at a No-Fault Clinic located at 700 Utica Ave, Brooklyn, New York. On March 4, 2024, more than 3 weeks after the prescriptions were issued, In & Out Rx dispensed Pennsaid External

Solution 2%, Lidocaine 5% Ointment, and Cyclobenzaprine to R.W. pursuant to prescriptions purportedly issued by NP Lafargue on February 7, 2024.

- On October 3, 2023, Insured L.T. was involved in a motor vehicle accident, and thereafter, sought treatment with NP Lafargue of South Bronx Medical at a No-Fault Clinic located at 2386 Jerome Ave, 2nd Floor, Bronx, New York. On February 26, 2024, <u>more than 3 weeks after</u> the prescriptions were issued, In & Out Rx dispensed Pennsaid External Solution 2%, Lidothol 4.5-5% Patches, and Cyclobenzaprine to L.T. pursuant to prescriptions purportedly issued by NP Lafargue on January 30, 2024.

119.    The Defendants' delays in dispensing the Fraudulent Pharmaceuticals, after allegedly being prescribed to Insureds injured in motor vehicle accidents, is in keeping with the fact that the Fraudulent Pharmaceuticals were provided solely to exploit the patients for financial gain, without regard for medical necessity or genuine patient care.

    **C.    The Fraudulent Lidocaine and Diclofenac Prescriptions**

120.    In accordance with the fraudulent scheme discussed above, and despite the best practices outlined above, the Pharmacies routinely billed GEICO for exorbitantly priced topical pain gels, ointments, and lotions, overwhelmingly in the form of Lidocaine 5% Ointment, Pennsaid External Solution 2%, and Diclofenac Sodium Gel 3%, pursuant to duplicitous prescriptions solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

    a. <u>The Fraudulent Topical Lidocaine Ointment</u>

121.    The Defendants solicited the Prescribers and the Clinic Controllers to provide them with voluminous prescriptions for Lidocaine 5% Ointment because the Defendants could readily buy Lidocaine 5% Ointment but bill GEICO and other New York No-Fault insurers through the Pharmacies for huge sums based on egregiously high wholesale prices.

122.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison

oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections. Notably, Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

123. Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

124. The NYS WCB's published guidelines stressed the risks of adverse side effects associated with topical pain medications such as lidocaine, by specifically stating that "topical agent[s] should be prescribed with strict instructions for application and maximum number of applications per day to obtain the desired benefit and avoid potential toxicity." See NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 38); NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 34). However, the Prescribers virtually never indicated the maximum dosage on any prescriptions for Lidocaine 5% Ointment.

125. Notably, Lidocaine ointments and patches with 4% Lidocaine are available over-the-counter and have a similar efficacy as Lidocaine 5% Ointment at a fraction of the cost.

126. Over-the-counter products such as Icy Hot Lidocaine which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10.

127. Despite this, the Prescribers never recommended Insureds first use over-the-counter lidocaine products to treat their minor aches and pains sustained in fender-bender type motor

vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to the Pharmacies, typically billing $1,522.50 to $1,697.50 per prescription.

128.    In further keeping with the fact that Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.

129.    Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

130.    In fact, pursuant to these fraudulent protocols and collusive arrangements, Insureds often received prescriptions for Lidocaine 5% Ointment, as well as other Fraudulent Topical Pain Products and Fraudulent Pharmaceuticals, as a matter of first line therapy regardless of their age or individual medical histories, injuries, subjective complaints, or other factors. These prescriptions were regularly issued by Prescribers at the time of the Insureds' initial examinations – within days of the accident – <u>without</u> the Prescribers first having recommended oral pain relievers or over-the-counter products.  For example:

- On October 13, 2021, Insured L.G. was allegedly involved in a motor vehicle accident. Thereafter, on October 15, 2021, only 2 days after the accident, Ataul Chowdhury, M.D. ("Dr. Chowdhury") prescribed Lidocaine 5% Ointment and Celecoxib (brand name: Celebrex) to L.G. pursuant to a pre-printed prescription form, which were dispensed and billed through Town Rx. Notably, Dr. Chowdhury's purported prescriptions are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider. Moreover, Dr. Chowdhury's purported signature on the pre-printed prescription form

does not match his signature on an assignment of benefits form signed by him, and appears to be photocopied.

- On October 13, 2021, Insured S.H. was allegedly involved in a motor vehicle accident. Thereafter, on October 15, 2021, only 2 days after the accident, Dr. Chowdhury prescribed Lidocaine 5% Ointment and Celecoxib (brand name: Celebrex) to S.H., which were dispensed and billed through Town Rx.  Notably, Dr. Chowdhury's purported prescriptions are invalid and illegal in that they are not electronic prescriptions nor are they official serialized New York State prescriptions bearing the legible, conspicuous imprinted or stamped name of the authorized prescribing healthcare provider. Moreover, Dr. Chowdhury's purported signature on the pre-printed prescription form does not match his signature on an assignment of benefits form signed by him, and appears to be photocopied.

- On July 25, 2023, Insured R.H. was allegedly involved in a motor vehicle accident. Thereafter, on July 27, 2023, only 2 days after the accident, Dr. McGee prescribed Lidocaine 5% Ointment, Diclofenac Sodium Gel 3%, and Cyclobenzaprine to R.H., which were dispensed and billed through Town Rx.

- On August 19, 2023, Insured C.T. was allegedly involved in a motor vehicle accident. Thereafter, on August 24, 2023, only 5 days after the accident, Dr. McGee prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, and Cyclobenzaprine to C.T., which were dispensed and billed through Town Rx.

- On August 19, 2023, Insured Z.W. was allegedly involved in a motor vehicle accident. Thereafter, on August 24, 2023, only 5 days after the accident, Dr. McGee prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, and Cyclobenzaprine to Z.W., which were dispensed and billed through Town Rx.

- On March 23, 2024, Insured J.N. was allegedly involved in a motor vehicle accident. Thereafter, on March 28, 2024, only 5 days after the accident, Dr. McGee prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, and Cyclobenzaprine to J.N., which were dispensed and billed through In & Out Rx.

- On April 26, 2024, Insured A.G. was allegedly involved in a motor vehicle accident. Thereafter, on May 3, 2024, only 7 days after the accident, Dr. McGee prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, and Cyclobenzaprine to A.G., which were dispensed and billed through In & Out Rx.

- On April 24, 2024, Insured C.B. was allegedly involved in a motor vehicle accident. Thereafter, on May 1, 2024, only 7 days after the accident, Dr. McGee prescribed Lidocaine 5% Ointment, Pennsaid External Solution 2%, and Cyclobenzaprine to C.B., which were dispensed and billed through In & Out Rx.

- On April 18, 2024, Insured C.I. was allegedly involved in a motor vehicle accident. Thereafter, on April 25, 2024, Dr. McGee prescribed Lidocaine 5 % Ointment,

Pennsaid External Solution 2%, and Cyclobenzaprine to C.I., which were dispensed and billed through In & Out Rx.

131.    The Defendants submitted exorbitant charges to GEICO typically ranging from $1,522.50 to $1,697.50 per prescription of Lidocaine 5% Ointment.

132.    Pursuant to their fraudulent scheme, the Defendants' billing to GEICO for Lidocaine 5% Ointment alone has exceeded $874,000.00.

133.    The Defendants' egregious billing coupled with the Prescribers failure to properly document the prescriptions for Lidocaine 5% Ointment, or the Insureds' use of this medication, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of Lidocaine 5% Ointment to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects and the availability of comparably effective and less-costly over-the-counter alternatives.

### b. The Fraudulent Diclofenac Prescriptions

134.    In addition to the excessive amounts of Lidocaine 5% Ointment dispensed by the Pharmacies, and to further maximize their profits, the Defendants also routinely billed GEICO – through Town Rx and In & Out Rx – for exorbitantly priced diclofenac sodium topical products i.e., Pennsaid External Solution 2% and Diclofenac Sodium Gel 3% (the "Topical Diclofenac Products"), pursuant to prescriptions solicited from Prescribers and Clinic Controllers.

135.    As with the prescriptions for Lidocaine 5% Ointment, the Defendants solicited the Prescribers and the Clinic Controllers to provide them with prescriptions for the Topical Diclofenac Products so they could bill for these pharmaceutical products at exorbitant charges, which further inflated the charges submitted to GEICO and other New York No-Fault insurers.

136.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

137.    The "Black Box Warning" warning is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

138.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

139.    Pennsaid External Solution 2% – one of the two diclofenac sodium topical products prescribed by the Prescribers and dispensed by the Defendants – is a topical NSAID that is <u>only</u> indicated to treat pain caused by osteoarthritis of the knees.

140.    Despite the FDA approved indications for the prescription and use of Pennsaid External Solution 2%, the Prescribers prescribed, and the Defendants dispensed excessive amounts of Pennsaid External Solution 2% to Insureds with no documented medical history of osteoarthritis of the knees.

141.    Diclofenac Sodium Gel 3%, another diclofenac sodium topical product dispensed and billed by the Defendant through Town Rx, is <u>only</u> FDA approved to treat a precancerous skin condition known as actinic keratosis and does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of topical diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

142.    In fact, with respect to treating acute pain (<u>e.g.</u>, from strains, sprains, contusions, or overuse injuries), clinical studies of topical NSAIDs approved by the FDA such as topical diclofenac 1% have shown they are no more effective than a placebo.  Further, there are no clinical

studies to support the use of Diclofenac Sodium Gel 3% for the treatment of acute pain and no evidence that topical diclofenac in concentrations of 3% is any more effective than topical diclofenac in concentrations of 1% – which is available over-the-counter at a fraction of the cost.

143.    Yet, Prescribers prescribed, and the Defendants dispensed, Diclofenac Sodium Gel 3% to Insureds with no documented history of  actinic keratosis or any precancerous skin conditions.

144.    In keeping with the fact that Topical Diclofenac Products were prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribers virtually never stated the medical basis for the prescriptions.

145.    Moreover, the Prescribers' follow-up examination reports virtually never addressed whether the Topical Diclofenac Products prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

146.    Notwithstanding the FDA approved uses for the Topical Diclofenac Products, or the risks associated with diclofenac sodium prescriptions, the Prescribers steered voluminous prescriptions to the Pharmacies for the Topical Diclofenac Products, and the Defendants dispensed and billed for these products in excessive amounts, pursuant to predetermined fraudulent protocols and collusive arrangements, without any genuine regard for patient care or safety,  or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

147.    The Defendants submitted exorbitant charges to GEICO typically ranging from $2,148.16 to $2,153.76 per prescription of Pennsaid External Solution 2%; and $1,888.00 per prescription of Diclofenac Sodium Gel 3%.

148.    Pursuant to their fraudulent scheme, the Defendants' billing to GEICO for Topical Diclofenac Products has exceeded $799,000.00.

**D.    The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Defendants, Prescribing Providers and Clinic Controllers**

149.    To effectuate the fraudulent scheme, the Defendants steered the Prescribers and Clinic Controllers to routinely prescribe and direct prescriptions to the Pharmacies for large volumes of the specifically targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Topical Pain Products) pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

150.    New York's statutory framework provides, among other things, that pharmacies and licensed medication professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

151.    Here, the Defendants colluded with Prescribers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then have those prescriptions directed to the Pharmacies so that the Defendants could bill GEICO huge sums.

152.    In furtherance of the scheme, the Prescribers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

153.    The Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

154.    The Defendants, in collusion with the Prescribers and Clinic Controllers, made sure the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to the Pharmacies notwithstanding that (i) in most instances the No-Fault Clinics and the patients themselves were located in counties far from the Pharmacies and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

155.    After having the prescriptions steered to Pharmacies, the Defendants purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, or alternatively, the

Insureds were given the Fraudulent Pharmaceuticals dispensed by the Pharmacies directly from the front desk staff at the various No-Fault Clinics.

156.    The Defendants, Prescribers, and Clinic Controllers virtually never gave the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by the Pharmacies, and to ensure that the Defendants benefitted financially from the prescriptions.

157.    The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to the patients, and the Pharmacies had no legitimate reason to dispense the Fraudulent Pharmaceuticals in large quantities to their patients.

158.    The Prescribers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to most of the patients.

159.    The Defendants, Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they profited from their participation in the illegal scheme.

160.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribers and Clinic Controllers would not have directed the prescriptions to the Pharmacies.

161.    The Defendants, Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid in kickbacks for steering the prescriptions to the Pharmacies since such kickbacks are in violation of New York law.

162.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by the Pharmacies.

163.    Upon information and belief, the payment of kickbacks or other financial consideration issued by the Defendants was made at or near the time the prescriptions were issued.

**E.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

164.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

165.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

166.    Notably, despite purporting to be separate entities, the Pharmacies submitted claims for reimbursement for Pennsaid External Solution 2% under the same NDC number (62332048712); and submitted certain claims for reimbursement for Lidocaine 5% Ointment under the same NDC number (51672300805) and Diclofenac Sodium Gel 3% under the same NDC

number (62332058131). In the event the Defendants legitimately purchased these Fraudulent Topical Pain Products, this would mean each of the Pharmacies purchased the Fraudulent Topical Pain Products from the suppliers in the same exact quantities.

167.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

168.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

169.    The Defendants solicited the Prescribers and Clinic Controllers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

170.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through the Pharmacies and to maximize their profits.

171.    In support of its charges, the Pharmacies typically submitted: (i) an NF-3 Form which included the purported NDC numbers, units, and corresponding charges for each drug product; (ii) a copy of the Prescribers' prescription; (iii) an examination report prepared by the Prescriber – or another healthcare professional associated with the same medical practice as the Prescriber; (iv) a delivery receipt; and (v) an assignment of benefit form assigning the Insureds' benefits to the Defendants.

172.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants through the Pharmacies are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

173.    The Defendants never submitted to GEICO their wholesale purchase invoices demonstrating how much the Defendants actually paid the supplier for the Fraudulent Topical Pain Products.

174.    The Defendants never submitted to GEICO any documents evidencing whether the Defendants actually purchased topical pain products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

175.    The Defendants also never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

176.    The Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products that the Defendants targeted to use in connection with the Pharmacies' billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA-approved, proven effective medications or commercially available over-the-counter products.

## IV.    The Defendants' Submission to GEICO of Fraudulent NF-3 Forms

177.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have consistently been submitted to GEICO by and on behalf of the Pharmacies seeking payment for pharmaceuticals for which they are ineligible to receive.

178.    These forms, including NF-3 Forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

i.      The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

ii.     The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Pharmaceuticals were medically unnecessary and Defendants did not comply with all material licensing requirements in that the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals in exchange for unlawful kickbacks and other financial incentives;

iii.    The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that the charges were proper and not excessive. In fact, the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO; and

iv.     The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Pharmaceuticals were medically unnecessary and the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and/or duplicitous prescriptions.

179.    As a direct result of Defendants' scheme, and in reliance on the fraudulent billing submissions made through the Pharmacies, GEICO was led to voluntarily issue payments to Defendants totaling approximately $323,002.17 in response to Defendants' billing submissions.

## V.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

180.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

181.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

182.    Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for medical necessity and genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

183.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

184.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

185.    Because the billing and supporting documentation submitted by Defendants did not reveal its fraudulent nature, GEICO voluntarily issued payments in response to the Defendants' billing submissions in accordance with the No-Fault Laws.

186.    GEICO  is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $323,002.17 representing voluntary payments made by GEICO based upon the submission of the fraudulent charges by the Defendants to GEICO, which damages are to be trebled under 18 U.S.C. § 1962(c)), et al. to $969,006.51.

187.    As noted above, as part of their fraudulent scheme, the Defendants have hired law firms to pursue collection from GEICO and other insurers of the fraudulent charges submitted through the Pharmacies.  These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against GEICO and other insurers if the charges are not promptly paid in full in order to monetize the Defendants' fraudulent activity as quickly as possible. In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacies have been engaged in fraud.

188.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## THE FIRST CLAIM FOR RELIEF
### Against All Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

189.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

190.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $1,350,132.17 in fraudulent pending billing for the Fraudulent Pharmaceuticals that the Defendants submitted, or caused to be submitted, to GEICO through the Pharmacies.

191.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacies billed for pharmaceutical products that were medically unnecessary and/or prescribed and dispensed pursuant to predetermined fraudulent protocols designed solely for financial gain, without regard for genuine patient care.

192.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceuticals that they acquired at low cost and had the Pharmacies dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

193.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives.

194.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, and/or duplicitous prescriptions.

195.    The Defendants, including the Pharmacies, violated New York State regulatory and licensing requirements, rendering the pharmacy ineligible to receive reimbursement for No-Fault Benefits.

196.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Pharmacies have no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to GEICO through the Pharmacies.

**THE SECOND CLAIM FOR RELIEF**
**Against M. Nisanov and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

197.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

198.    Town Rx is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

199.    M. Nisanov and the John Doe Defendants knowingly conducted and/or participated, directly or indirectly, in the conduct of Town Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and/or federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years, seeking payments that Town Rx was not eligible to receive

under the No-Fault Laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to Town Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Town Rx dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (iv) the billed-for pharmaceutical products were the product of illegal, invalid, and/or duplicitous prescriptions. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

200.    Town Rx's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud and wire fraud are the regular way in which M. Nisanov and the John Doe Defendants operated Town Rx, inasmuch as Town Rx never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Town Rx to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Town Rx to the present day.

201.    Town Rx is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants. These inherently unlawful acts are taken by Town Rx in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

202.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $216,774.76 pursuant to the fraudulent bills submitted by the Defendants through Town Rx.

203.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against M. Nisanov and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

204.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

205.    Town Rx is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

206.    M. Nisanov and the John Doe Defendants are employed by and/or associated with the Town Rx enterprise.

207.    M. Nisanov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Town Rx's affairs,

through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and/or federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Town Rx was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to Town Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Town Rx dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (iv) the billed-for pharmaceutical products were the product of illegal, invalid, and/or duplicitous prescriptions. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

208.    M. Nisanov and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO and by continuing to seek collection of those fraudulent charges.

209.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $216,774.76 pursuant to the fraudulent bills submitted by the Defendants through Town Rx.

210.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE FOURTH CLAIM FOR RELIEF
**Against Town Rx, M. Nisanov and the John Doe Defendants**
**(Common Law Fraud)**

211.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

212.    Town Rx, M. Nisanov and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Town Rx.

213.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceutical products were medically necessary and properly billed when in fact the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Town Rx acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic

Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to Town Rx in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Town Rx acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that that they acquired at low cost and had Town Rx dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (iv) in every claim, the representation that Town Rx acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for pharmaceutical products were the product of illegal, invalid, and/or duplicitous prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

214.    Town Rx, M. Nisanov and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Town Rx that were not compensable under the No-Fault Laws.

215.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $216,774.76 pursuant to the fraudulent bills submitted, or caused to be submitted, by Town Rx, M. Nisanov and the John Doe Defendants through Town Rx.

216.    Town Rx, M. Nisanov and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

217.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE FIFTH CLAIM FOR RELIEF
**Against Town Rx, M. Nisanov and the John Doe Defendants**
**(Unjust Enrichment)**

218.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

219.    As set forth above, Town Rx, M. Nisanov and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

220.    When GEICO paid the bills and charges submitted by or on behalf of Town Rx for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Town Rx, M. Nisanov and the John Doe Defendants' improper, unlawful, and/or unjust acts.

221.    Town Rx, M. Nisanov and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Town Rx, M. Nisanov and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

222.    Town Rx, M. Nisanov and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

223.    By reason of the above, Town Rx, M. Nisanov and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $216,774.76.

## THE SIXTH CLAIM FOR RELIEF
### Against In & Out Rx, B. Nisanov and the John Doe Defendants
### (Common Law Fraud)

224.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

225.    In & Out Rx, B. Nisanov and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of In & Out Rx.

226.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceutical products were medically necessary and properly billed when in fact the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that In & Out Rx acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to In & Out Rx in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that In & Out Rx acted in accordance with material licensing

requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had In & Out Rx dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (iv) in every claim, the representation that In & Out Rx acted in accordance with material licensing requirements and is therefore eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for pharmaceutical products were the product of illegal, invalid, and/or duplicitous prescriptions.

227.    In & Out Rx, B. Nisanov and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through In & Out Rx that were not compensable under the No-Fault Laws.

228.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $106,227.41 pursuant to the fraudulent bills submitted, or caused to be submitted, by In & Out Rx, B. Nisanov and the John Doe Defendants through In & Out Rx.

229.    In & Out Rx, B. Nisanov and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

230.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE SEVENTH CLAIM FOR RELIEF
**Against In & Out Rx, B. Nisanov and the John Doe Defendants**
**(Unjust Enrichment)**

231.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

232.    As set forth above, In & Out Rx, B. Nisanov and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

233.    When GEICO paid the bills and charges submitted by or on behalf of In & Out Rx for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on In & Out Rx, B. Nisanov and the John Doe Defendants' improper, unlawful, and/or unjust acts.

234.    In & Out Rx, B. Nisanov and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that In & Out Rx, B. Nisanov and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

235.    In & Out Rx, B. Nisanov and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

236.    By reason of the above, In & Out Rx, B. Nisanov and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $106,227.41.

## THE EIGHTH CLAIM FOR RELIEF
### Against M. Nisanov, B. Nisanov and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

237.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

238.    Town Rx and In & Out Rx constitute an association-in-fact "enterprise" (the "Pharmacy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

239.    The members of the Pharmacy Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Town Rx and In & Out Rx are ostensibly independent entities – with different names and tax identification numbers – that were created and used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

240.    The Pharmacy Enterprise operated under two separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one entity. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Pharmacy Enterprise acting individually or without the aid of each other.

241.    The Pharmacy Enterprise is distinct from, and has an existence beyond the pattern of racketeering that is described herein, namely by namely by employing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud and wire fraud

(i.e., the submission of the fraudulent bills to GEICO); by creating and maintaining patient files and other records; by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance payments; by selecting and purchasing the targeted Fraudulent Pharmaceuticals from wholesalers; by coordinating the fraudulent scheme with various Prescribers and Clinic Controllers operating at No-Fault Clinics including obtaining prescriptions from them and delivering the Fraudulent Pharmaceuticals to them to dispense to Insureds; by facilitating payments stemming from the illegal kickback arrangements; and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

242.    M. Nisanov, B. Nisanov and the John Doe Defendants were employed by and/or associated with the Pharmacy Enterprise and knowingly conducted and/or participated, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and/or federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years, along with continued efforts to collect on those charges, seeking payments that Town Rx and In & Out Rx were not eligible to receive under the No-Fault Laws. Specifically, the acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341:

(i) M. Nisanov, B. Nisanov and the John Doe Defendants devised, executed, and/or knowingly assisted in carrying out a scheme to defraud GEICO of their money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the healthcare claims for payment;

(ii) Pursuant to the scheme, M. Nisanov, B. Nisanov and the John Doe Defendants submitted, or caused to be submitted, to GEICO, through the Pharmacy

Enterprise, false and fraudulent claims and information in which they falsely represented that the Fraudulent Pharmaceuticals the Pharmacy Enterprise billed for were medically necessary when in fact they were not medically necessary and were instead dispensed and billed pursuant to predetermined fraudulent treatment protocols designed solely to maximize profits, without regard to genuine patient care; and

(iii) Pursuant to the scheme, M. Nisanov, B. Nisanov and the John Doe Defendants submitted, or caused to be submitted, to GEICO, through the Pharmacy Enterprise, false and fraudulent claims and information in which they concealed that the charges submitted were for pharmaceuticals provided pursuant to illegal, collusive agreements, kickbacks, illegal, invalid, and/or duplicitous prescriptions, and for financial incentives rather than genuine patient care.

243.    For the purpose of executing this scheme and artifice to defraud, M. Nisanov, B. Nisanov and the John Doe Defendants submitted, or caused to be submitted, false and fraudulent claims and information to GEICO by use of the mail and/or interstate wire that caused GEICO to make payments for said fraudulent claims. A representative sample of the fraudulent bills and corresponding mailings/wires submitted to GEICO through the Pharmacy Enterprise that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "2".

244.    The Pharmacy Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers and seeking to collect on the submitted fraudulent charges. The predicate acts of mail and wire fraud are the regular way in which M. Nisanov, B. Nisanov, and the John Doe Defendants operated the Pharmacy Enterprise and acts of mail and wire fraud therefore are essential for the Pharmacy Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail and wire fraud, changing of TIN numbers and entities, implies a threat of continued criminal activity, as does the fact that M. Nisanov, B. Nisanov, and the John Doe Defendants continue to attempt collection on the fraudulent billing submitted through the Pharmacy Enterprise to the present day.

245.    The Pharmacy Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO (and likely other automobile insurers). These inherently unlawful acts are taken by the Pharmacy Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO (and likely other automobile insurers) through fraudulent no-fault billing.

246.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $323,002.17 pursuant to the fraudulent bills submitted in furtherance of the Pharmacy Enterprise.

247.    By reason of their injuries, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THE NINTH CLAIM FOR RELIEF
**Against M. Nisanov, B. Nisanov and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

248.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

249.    Town Rx and In & Out Rx constitute an association-in-fact "enterprise" (the "Pharmacy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

250.    M. Nisanov, B. Nisanov, and the John Doe Defendants are employed by and/or associated with the Pharmacy Enterprise and knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Pharmacy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341 and/or federal wire fraud statute, 18 U.S.C. § 1343, based

upon the use of the United States mails and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis – and to continue efforts to collect on those charges on a continuous basis for over three years, along with continued efforts to collect on those charges, seeking payments that Town Rx and In & Out Rx were not eligible to receive under the No-Fault Laws. Specifically, the acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 134:

(i) M. Nisanov, B. Nisanov, and the John Doe Defendants agreed, combined and conspired to devise, execute, and/or knowingly assist in carrying out a scheme to defraud GEICO of their money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the healthcare claims for payment;

(ii) Pursuant to the scheme, M. Nisanov, B. Nisanov, and the John Doe Defendants agreed, combined and conspired to submit, or caused to be submitted, to GEICO, through the Pharmacy Enterprise false and fraudulent claims and information in which M. Nisanov, B. Nisanov, and the John Doe Defendants agreed, combined and conspired to falsely represent that the Fraudulent Pharmaceuticals the Pharmacy Enterprise billed for were medically necessary when in fact they were not medically necessary and were instead dispensed and billed pursuant to predetermined fraudulent treatment protocols designed solely to maximize profits, without regard for genuine patient care; and

(iii) Pursuant to the scheme, M. Nisanov, B. Nisanov, and the John Doe Defendants agreed, combined and conspired to submit, or caused to be submitted, to GEICO, through the Pharmacy Enterprise, false and fraudulent claims and information in which M. Nisanov, B. Nisanov, and the John Doe Defendants agreed, combined and conspired to conceal that the charges submitted were for services provided pursuant to illegal, collusive agreements, kickbacks, illegal, invalid, and/or duplicitous prescriptions, and for financial incentive rather than genuine patient care.

251. M. Nisanov, B. Nisanov, and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

252.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $323,002.17 pursuant to the fraudulent bills submitted through the Pharmacies.

253.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim For Relief against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Pharmacies have no right to receive payment for any pending bills, amounting to approximately $1,350,132.17 in charges submitted to GEICO;

B.    On the Second Claim For Relief against M. Nisanov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $216,774.76, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.    On the Third Claim For Relief against M. Nisanov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $216,774.76, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.    On the Fourth Claim For Relief against Town Rx, M. Nisanov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but

approximately $216,774.76, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Claim For Relief against Town Rx, M. Nisanov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $216,774.76, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Claim For Relief against In & Out Rx, B. Nisanov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $106,227.41, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Claim For Relief against In & Out Rx, B. Nisanov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $106,227.41, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Claim for Relief Against M. Nisanov, B. Nisanov, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $323,002.17, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

I.      On the Ninth Claim For Relief against M. Nisanov, B. Nisanov, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $323,002.17, together with together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York

     April 18, 2025

                         RIVKIN RADLER LLP

                         By:   */s/ Michael A. Sirignano, Esq.*
                               Michael A. Sirignano
                               Barry I. Levy
                               Jennifer Abreu
                               Alexandra Cusano
                       926 RXR Plaza
                       Uniondale, New York 11556
                       (516) 357-3000

                     *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*